UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

ALEXEI PLESTSOV,
DENIS NAZAROV,
ROMAN KALABAYDA,
Individually and on behalf of other similarly
situated member of putative class                    )
                                                      )
                        Plaintiffs,                   )
                                                      )
v.                                                    ) Civil Action No:
                                                      )
GTS TRANSPORTATION CORPORATION )  **JURY DEMANDED**
TOMAS STIRBYS                                         )
                                                      )
                        Defendants.                   )

### CLASS ACTION COMPLAINT

Julia Bikbova
**Bikbova Law Offices, P.C.**
666 Dundee Road, Suite 1604
Northbrook, IL 60062
(847) 730-1800
julia@bikbovalaw.com
ARDC 6291400

*Attorney for Plaintiffs*

1

**I.**    NATURE OF THE CASE…………………………………………………...………..3

**II.**   PARTIES…………………………………………………………………...…4

**III.**  JURISDICTION AND VENUE…………………………………………………6

**IV.**   RELEVANT STATUTES AND REGULATIONS…………………………….…...6

**V.**    STATEMENT OF FACTS……………………………………………...………..9

**VI.**   CLASS ALLEGATIONS………………………………………………………23

**VII.**  COUNT I…………………………………………………………...…….........25

**VIII.** COUNT II………………………………………………………..…..……26

**IX.**   JURY DEMAND……………………………………………………………..27

**X.**    PRAYER FOR RELIEF…………………………………………………...27

Plaintiffs Alexei Plestsov, Denis Nazarov, and Roman Kalabayda, (collectively, "Plaintiffs" or "Named Plaintiffs"), by their attorney, Julia Bikbova of Bikbova Law Offices, P.C., bring their claims as a class action against GTS Transportation Corporation, ("GTS" OR "Defendant Company" or "Corporate Defendant") and its executive Tomas Stirbys ("Individual Defendant"), on behalf of all other similarly situated current and former truck drivers who worked for GTS in the State of Illinois at any time during the applicable limitations period, and who were misclassified as independent contractors. The cause of action is the violations of Illinois Wage Payment and Collection Act, ("IWPCA"), 820 ILCS § 115/. Plaintiffs allege that in addition to being misclassified, they were not paid proper wages and that improper deductions were made from their wages, in violation of the IWPCA, 820 ILCS 115/9, and that GTS failed to reimburse the Plaintiffs for the work-related expenses, in violation of the IWPCA, 820 ILCS 115/9.5. In the alternative, Plaintiffs allege that Defendants were unjustly enriched, and that Plaintiffs should recover in *quantum meruit.*

## I.     NATURE OF THE CASE

1. Plaintiffs worked as truck driver for Defendant Company GTS, which is owned and operated by Tomas Stirbys, Individual Defendant. Throughout their employment, they were misclassified as independent contractors, and consistently underpaid by means of illegal deductions from their compensation to which they did not agree, and were not paid for all work that they performed for GTS.

2. In disregard of Section 9.5 of IWPCA which went into effect on January 1, 2019, GTS refused to reimburse its truck drivers for the expenses that the drivers incurred that were necessary in the performance of the work duties and tasks for GPS.

3. GTS "doctored" the logbooks, forcing its drivers to comply under a threat of termination of employment if drivers were to refuse. Defendant company, at the direction of Individual

Defendant, would consistently pay its drivers, who were to be compensated on a per mile basis, for the deliveries "zip code-to zip code", as opposed to paying for the actual miles driven by GTS drivers to complete the deliveries.

4. In addition, GTS, at the direction of Individual Defendant, "doctored" the dollar amounts on the freight/load confirmations that GTS staff would receive from its customers and/brokers and present to drivers who were compensated on a percentage of freight/load confirmation' dollar amount the forged confirmations, so that the compensation of the drivers would result in a lesser dollar amount than what they would actually earn.

5. By doing so, Defendant Company and the Individual Defendant, who controlled it and directed GTS' policies of misclassification of drivers and deductions, violated multiple provisions of the Illinois Wage Payment and Collection Act, 820 ILCS § 115/.

6. In an alternative to claims pursuant to IWPCA, Plaintiffs will seek equitable remedies of recovery on *quantum meruit* basis for Unjust Enrichment.

7. Plaintiffs bring this action on a class basis as to all causes of actions and bases for relief, on behalf of all similarly situated drivers who worked or work at Defendant Company. The violations experienced by Plaintiffs were not discrete occurrences, but constituted a business model for GTS. Plaintiffs maintain that all truck drivers who worked or work for GTS were or are misclassified, underpaid, and subjected to illicit deductions.

## II. PARTIES

8. Plaintiff Alexei Plestsov worked as a truck driver for GTS in Illinois as a non-exempt employee, compensated on a basis of a percentage of receipts of GTS per freight/load/cargo confirmation provided to GTS by its customers or brokers, during the applicable statute of limitations period, and at all relevant times was a full time "employee" within the meaning of the IWPCA, 820 ILCS § 115/2.

9. Plaintiff Denis Nazarov, a resident of Illinois, worked as a truck driver in Illinois as a non-exempt employee for GTS, compensated on a per mile basis, during the applicable statute of limitations period, and at all relevant times was a full time "employee" within the meaning of the IWPCA, 820 ILCS § 115/2.

10. Plaintiff Roman Kalabayda, a resident of Illinois, worked as a truck driver for GTS in Illinois as a non-exempt employee, compensated on a basis of a percentage of receipts of GTS per freight/load/cargo confirmation provided to GTS by its customers or brokers, during the applicable statute of limitations period, and at all relevant times was a full time "employee" within the meaning of the IWPCA, 820 ILCS § 115/2.

11. Plaintiffs bring this case on behalf of themselves and others who currently work, and who previously worked as drivers for GTS at any time during the relevant statute of limitations preceding the filing of the original complaint (hereinafter "Violation Period") and were misclassified as independent contractors.

12. At all relevant times hereto, Defendant GTS has been an Illinois corporation engaged in the transportation and delivery business in Illinois and throughout the United States. GTS conducts business in Illinois and operates facilities in Illinois. Defendant GTS has at all relevant times been an "employer" of Plaintiffs and other similarly situated truck drivers of GTS, within the meaning of the IWPCA, 820 ILCS § 115/2.

13. Defendant Tomas Stirbys, on information and belief, is the sole shareholder of GTS and has been its incorporator and founder. Individual Defendant has also been GTS' an actual executive, president, and the key decision maker as to misclassification of drivers, their compensation, and hiring and termination policies. Defendant Stirbys caused or otherwise knowingly permitted GTS to violate IWPCA. As such, at all relevant times Defendant Tomas Stirbys was an "employer" of Plaintiffs within the meaning of IWPCA, 820 ILCS § 115/13.

### III.   JURISDICTION AND VENUE

14. This court has personal jurisdiction over Plaintiffs and the class they seek to represent because two of the named Plaintiffs and some putative class members are citizens of the State of Illinois and work or worked for the Defendant Company in the State of Illinois, including this judicial district.

15. This Court has personal jurisdiction over Defendants because the Defendant company is registered in Illinois and does business Illinois, including this judicial district, and its conduct in Illinois, including this judicial district, underlies all claims in this suit. The Individual Defendant is also a citizen of Illinois and lives in this judicial district.

16. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) as this matter is a civil action in which Plaintiffs' claims exceed $75,000 and the matter in controversy exceeds the sum or value of $5,000,000 on class basis, exclusive of interest and costs.

17. Some members of a putative class of plaintiffs are citizens of a State different from any defendant. One of the named Plaintiffs is a citizen of another state – Oregon. In addition, at least two thirds of putative class members are citizens of states other than Illinois. Notwithstanding their citizenship and residency, all Plaintiffs and putative class members worked for Defendant company in Illinois.

18. Venue is proper in this District pursuant to 28 U.S.C§ 1391(b)(2) because a substantial part of the events or omissions which gave rise to IWPCA violations occurred in the Northern District of Illinois.

### IV. RELEVANT STATUTES AND REGULATIONS

19. The Illinois Wage Payment and Collection Act ((820 ILCS 115/) protects Illinois workers from misclassification, underpayment of wages and compensation, unauthorized deductions, and

untimely payment of earned compensation. Just as other Illinois wage laws, the IWPCA is a public interest law.

20. Under Section 2 of the IWPCA, "For all employees, other than separated employees, "wages" shall be defined as any compensation owed an employee by an employer pursuant to an employment contract or agreement between the 2 parties, whether the amount is determined on a time, task, piece, or any other basis of calculation." 820 ILCS 115/2.

21. Under Section 3 of the IWPCA, "Every employer shall be required, at least semi-monthly, to pay every employee all wages earned during the semi-monthly pay period." 820 ILCS 115/3.

22. Under Section 4 of the IWPCA, "All wages earned by any employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than 13 days after the end of the pay period in which such wages were earned. All wages earned by any employee during a weekly pay period shall be paid not later than 7 days after the end of the weekly pay period in which the wages were earned. All wages paid on a daily basis shall be paid insofar as possible on the same day as the wages were earned, or not later in any event than 24 hours after the day on which the wages were earned." 820 ILCS 115/4.

23. Under Section 5 of the IWPCA, "Every employer shall pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such employee." 820 ILCS 115/5.

24. Under Section 9 of the IWPCA, "Except as hereinafter provided, deductions by employers from wages or final compensation are prohibited unless such deductions are (1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; (4) made with the express written consent of the employee, given freely at the time the deduction is made; (5) made by a municipality with a population of 500,000 or more . . . or (6) made by a housing authority in a municipality with a population of 500,000 or

more…" 820 ILCS 115/9.

25. Under Section 9.5 of the IWPCA, "An employer shall reimburse an employee for all necessary expenditures or losses incurred by the employee within the employee's scope of employment and directly related to services performed for the employer. As used in this Section, "necessary expenditures" means all reasonable expenditures or losses required of the employee in the discharge of employment duties and that inure to the primary benefit of the employer."

26. Under Section 10 of the IWPCA, "Employers shall notify employees, at the time of hiring, of the rate of pay and of the time and place of payment. Whenever possible, such notification shall be in writing and shall be acknowledged by both parties. Employers shall also notify employees of any changes in the arrangements, specified above, prior to the time of change." 820 ILCS 115/10.

27. Under Section 13 of the IWPCA, "In addition to an individual who is deemed to be an employer pursuant to Section 2 of this Act, any officers of a corporation or agents of an employer who knowingly permit such employer to violate the provisions of this Act shall be deemed to be the employers of the employees of the corporation." 820 ILCS 115/13.

28. Under Section 14(a) of the IWPCA, "Any employee not timely paid wages, final compensation, or wage supplements by his or her employer as required by this Act shall be entitled to recover through a claim filed with the Department of Labor or in a civil action, but not both, the amount of any such underpayments and damages of 2% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid. In a civil action, such employee shall also recover costs and all reasonable attorney's fees. 820 ILCS 115/14.

## V. STATEMENT OF FACTS

Plaintiff Plestsov's Employment

29. Plaintiff Plestsov worked as a full-time employee for GTS for approximately five months, between November 5, 2018 and February 20, 2019. He worked as a truck driver delivering goods across state lines.

30. Mr. Plestsov learned of the truck driver position at GTS through a friend. He interviewed for his position at the end of October of 2018, and his interview took place at GTS' offices at 7545 S. Madison St., Burr Ridge, IL 60527.

31. Mr. Plestsov spoke to Aleksandr, GTS' manager, and Olivia, GTS' HR employee. They orally offered him a job as a truck driver for GTS. The terms of employment, communicated orally, were as follows: that for each load hauled he would be receive 82% of the dollar amount on the freight/load confirmation that GTS would receive from its customers and/or brokers, less the cost of fuel and other expenses of GTS that would be subtracted from his compensation such as IFTA.

32. One of the GTS staff interviewing Plaintiff Plestsov and extending the offer to him also stated orally that the terms of employment include his fulltime commitment to work only for GTS, that he could operate only GTS trucks (and Plaintiff Plestsov did not have his own truck or otherwise an equipment to operate in commission of his duties for GTS), and that he could not work for any other company during the course of his employment with GTS.

33. GTS staff also told him that the terms of employment dictate that he must regularly report to GTS dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the GTS' strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to GTS staff and office in Illinois.

34. GTS staff also required him to take and pass the drug test, submit prior employment history, and execute required paperwork on the spot if he wanted to have the job at GTS.

35. Mr. Plestsov accepted GTS' job offer and was hired by GTS, whereby he drove a truck with GTS branding, insured by GTS, and owned by GTS.

36. During Plaintiff Plestsov's interview, Aleksandr and Olivia presented him with some unknown documents. He was told that he had to sign the documents in order to begin working, and was not allowed to take them home to review first. He was not allowed to consult with a translator or legal counsel prior to signing the documents, and due to his lack of English fluency and low legal sophistication, Plaintiff Plestsov did not understand most of what he was signing.

37. During GTS failed and refused to pay Plaintiff for some work performed.

38. GTS made deductions from Plaintiff's compensation to which he did not consent, including "escrow" of $3250 which was never repaid to him, "repairs" of $485, "uber" $62.20. These were not deductions on a regular monthly, weekly or any other basis, and were never agreed to in writing before such deductions were taken.

39. GTS refused to reimburse Plaintiff for the expenses he incurred which GTS subtracted from his pay. For the time that Plaintiff Plestsov worked in 2019, GTS deducted $17,181.52 from Plaintiff's pay as charge backs of GTS's operational expenses, for which GTS did not reimburse Plaintiff Plestsov. Plaintiff Plestsov requested GTS to reimburse him for the expenses he incurred which were actually deducted from his compensation in 2019, but GTS refused to reimburse him.

40. GTS forged the freight confirmations presented to Plaintiff upon which his pay was based. Plaintiff does not know precisely how much he was underpaid by, because all relevant freight confirmation documents, which are genuine and original as received by GTS from its

customers and/or brokers, are in GTS' possession and control.

41. In addition, GTS failed to pay the final paycheck for the work that Plaintiff Plestsov performed between February 6, 2019 and February 20, 2019, totaling which is approximately $3000.61.

42. Without considering the unpaid compensation due to forged freight/load confirmations, Plaintiff Plestsov believes he suffered damages in the amount of $23,979.63.

43. In the 12 months since, $5,755.11 in statutory interest under the IWPCA has accrued.

44. In total, inclusive of statutory interest, Plaintiff Plestsov is owed at least approximately $29,734.74 by Defendants, exclusive of any additional damages to be determined after the review of genuine original freight/load confirmations and any further interest that will accrue.

45. Based on information Plaintiff Plestsov learned from other drivers, including other named Plaintiffs, the forgeries of freight confirmations typically resulted in being underpaid by approximately 10 percent. Accordingly, once the exact figures of underpayment per forged records are determined, Plaintiff Plestsov may assert additional damages.

Plaintiff Nazarov's Employment

46. Plaintiff Nazarov worked as a full-time employee for Defendants for approximately five months. He worked as a truck driver delivering goods across state lines.

47. Mr. Nazarov worked for GTS between October of 2018 and April of 2019.

48. Mr. Nazarov learned of the truck driver position at GTS through the website Chicago.ru. He interviewed for his position as a per mile truck driver at the end of October of 2018, and his interview took place at Defendants' offices at 7545 S. Madison St., Burr Ridge, IL 60527.

49. Mr. Nazarov spoke to Andrew, a GTS manager, at his interview. He orally offered Plaintiff a job as a truck driver for GTS, where he would drive on a per mile basis, paid $0.60 per mile.

50. GTS staff interviewing Plaintiff Nazarov and extending the offer to him also stated orally that

the terms of employment include his fulltime commitment to work only for GTS, that he could operate only GTS trucks (and Plaintiff Nazarov did not have his own truck or otherwise an equipment to operate in commission of his duties for GTS), and that he could not work for any other company during the course of his employment with GTS.

51. GTS staff also told him that the terms of employment dictate that he must regularly report to GTS dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the GTS' strict time constraints for deliveries and other instructions, including to be in constant communication and reporting to GTS staff and office in Illinois.

52. GTS staff also required him to take and pass the drug test, submit prior employment history, and execute required paperwork on the spot if he wanted to have the job at GTS.

53. Mr. Nazarov accepted GTS' job offer, was hired by GTS and drove a truck with GTS branding.

54. During Plaintiff Nazarov's interview, Andrew presented him with some unknown documents. He was told that he had to sign the documents in order to begin working, and was not allowed to take them home to review first. He was not allowed to consult with a translator or legal counsel prior to signing the documents, and due to his lack of English fluency and low legal sophistication, Plaintiff Nazarov did not understand most of what he was signing.

55. The Defendants failed and refused to pay Plaintiff and others similarly situated for some work performed.

56. Plaintiff was unpaid by approximately $2,600. This sum includes illicit deductions from his pay, for reasons such $420 'driver cash advance', $100 'insurance escrow', which were never discussed or agreed upon. These were not deductions on a regular monthly, weekly or any other basis, and were never agreed to in writing before such deductions were taken. If there

was a cash advance given to Plaintiff, Plaintiff spent it on truck maintenance and operational needs.

57. The sum also includes the wages that were not paid at all such as for the time he worked during 'layover' and for extra stops he was made do, even though he was promised at hiring that he would be paid for layovers and extra stops and any work he would do for GTS overall. He was not paid for

58. This amount also includes a number of expenses that Plaintiff Nazarov had to pay out of pocket in 2019 in order to be able to work for GTS, such as the cost of purchasing new GPS, tire gage, repair tools. Plaintiff Nazarov requested GTS to reimburse him for the expenses he incurred and paid out of pocket in 2019, but GTS refused to reimburse him.

59. In addition, he was underpaid by approximately 10% of all miles driven because GTS was paying for the purported miles based on a "zip code to zip code" formula, as opposed to the actual miles that he drove. As a result, over his 24 weeks of employment, Plaintiff Nazarov was underpaid by $2,500 for the work that he performed due to reduction of miles he actually drove.

60. In total, Plaintiff Nazarov estimates that he was underpaid by a total of at least $5,100.00.

61. In the 11 months since the end of Plaintiff Nazarov's employment, $1,241.21 in statutory interest under the IWPCA has accrued upon his underpayment, for a total of $6,341.21 to the date of filing.

62. Plaintiff Nazarov was charged a $1,000 "escrow" at hiring, which he did not consent to. In essence, Plaintiff was working for GTS and being paid for some first weeks of his work. This sum was returned to him 24 weeks later, when he left GTS, by which time $126.16 in statutory interest had accrued.

63. In total, inclusive of statutory interest up to the date of filing of this Complaint, Plaintiff

Nazarov is owed at least approximately $6,467.37 by Defendants.

Plaintiff Kalabayda's Employment

64. Plaintiff Kalabayda worked as a full-time employee for GTS for approximately eighteen months, between May of 2018 and October of 2019. He worked as a truck driver delivering goods across state lines.

65. Mr. Kalabayda learned of the truck driver position through an online advertisement. He interviewed for his position at the end of October of 2018, and his interview took place at GTS' offices at 7545 S. Madison St., Burr Ridge, IL 60527.

66. At hiring interview, Mr. Kalabayda spoke to Individual Defendant Stirbus and safety manager Olga. Defendant Stirbys orally offered him a job as a truck driver for GTS. The terms of employment communicated orally were as follows: that for each load hauled he would be receive 78% of the dollar amount on the freight/load confirmation that GTS would receive from its customers and/or brokers, less the cost of fuel and other expenses of GTS that would be subtracted from his compensation such as IFTA. This percentage was promised to be increased to 88% after a few months of employment.

67. Defendant Stirbys also stated orally that the terms of employment include his fulltime commitment to work only for GTS, that he could operate only GTS trucks (and Plaintiff Kalabayda did not have his own truck or otherwise an equipment to operate in commission of his duties for GTS), and that he could not work for any other company during the course of his employment with GTS.

68. The Individual Defendant also told him that the terms of employment dictate that he must regularly report to GTS dispatchers to take their instructions as to which loads to haul, where, which routs to take, and that he would have to comply with the GTS' strict time constraints for deliveries and other instructions, including to be in constant communication and reporting

to GTS staff and office in Illinois.

69. GTS staff also required him to take and pass the drug test, submit prior employment history, and execute required paperwork on the spot if he wanted to have the job at GTS.

70. Mr. Kalabayda accepted GTS' job offer and was hired by GTS, whereby he drove a truck with GTS branding, insured by GTS, and owned by GTS.

71. During Plaintiff Kalabayda's interview, Individual Defendant presented him with some unknown documents. He was told that he had to sign the documents in order to begin working, and was not allowed to take them home to review first. He was not allowed to consult with a translator or legal counsel prior to signing the documents, and due to his lack of English fluency and low legal sophistication, Plaintiff Kalabayda did not understand most of what he was signing.

72. During GTS failed and refused to pay Plaintiff Kalabayda for some work performed.

73. GTS made deductions from Plaintiff's compensation to which he did not consent, including "escrow" of $5000 which was never repaid to him, "repairs" of $5,155.10 and $3,521.55, "claims" of $2,000.00 and $1,000.00, "ticket" of $420.25. These were not deductions on a regular monthly, weekly or any other basis, and were never agreed to in writing before such deductions were taken.

74. GTS refused to reimburse Plaintiff for the expenses he incurred which GTS subtracted from his pay. For the time that Plaintiff Kalabayda worked in 2019, GTS deducted $52,000 from Plaintiff's pay as charge backs of GTS's operational expenses, for which GTS did not reimburse Plaintiff Kalabayda. Plaintiff Kalabayda requested GTS to reimburse him for the expenses he incurred which were actually deducted from his compensation in 2019, but GTS refused to reimburse him.

75. Collectively, Plaintiff Kalabayda estimates the total deductions over the course of his nearly

a year and a half employment with GTS are $59,575.35.

76. GTS forged the freight confirmations presented to Plaintiff upon which his pay was based. Plaintiff does not know precisely how much he was underpaid by, because all relevant freight confirmation documents, which are genuine and original as received by GTS from its customers and/or brokers, are in GTS' possession and control.

77. However, on at least three occasions during the Spring and Summer of 2019, Plaintiff Kalabayda learned from the brokers and GTS staff of the actual figures on the original or genuine freight/load confirmations, and even received at l such genuine confirmation from a broker of GTS which he compared to the one GTS presented him for the same load hauled. Based on such verification, Plaintiff Kalabayda learned that he was underpaid by approximately 10% for the work he did while hauling loads for GTS per orders in accordance with said freight/load confirmations.

78. In the 5 months since, $5957.53 in statutory interest under the IWPCA has accrued.

79. In total, inclusive of statutory interest, Plaintiff Kalabayda is owed at least approximately $65,532.88 by Defendants, exclusive of any additional damages to be determined after the review of genuine original freight/load confirmations and any further interest that will accrue.

80. Based on information Plaintiff Kalabayda already has to forgeries of fright confirmations and similar information learned from other drivers, the forgeries of freight confirmations typically resulted in being underpaid by approximately 10 percent. Accordingly, once the exact figures of underpayment per forged records are determined, Plaintiff Kalabayda may assert additional damages.

Defendant company's control over Plaintiffs' employment

81. Defendant Tomas Stirbys and other personnel of GTS managed all of the Plaintiffs' and others' similarly situated work for GTS, including the number of hours worked, the distances

driven, and the tasks performed by Plaintiffs and others similarly situated.

82. Defendant Stirbys and other personnel of GTS exerted full control over Plaintiffs' workdays and working conditions. They dictated, controlled and ratified the wages paid, hours worked, tasks set, and all related employee compensation policies and practices, including that of company drivers and owner-operators.

83. Defendant Stirbys and other personnel of Defendant companies required Plaintiffs and all other similarly situated truck drivers to review and sign company paperwork in complicated legalese English presented to them at the head office in Illinois and to complete the inspection of the equipment alongside GTS' safety managers or other staff at the head office in Illinois. They also required the Plaintiffs and all other similarly situated truck drivers to submit to mandatory drug testing in nearby Illinois facilities in order to commence employment. These were mandatory conditions of employment, which Plaintiffs had to fulfill in order to work for GTS.

84. Plaintiffs regularly had to commute back and forth from GTS' Illinois office, driving through Illinois to and from the office, in order to fill out paperwork, receive instructions, attend inspections, and otherwise abide by GTS' procedures.

85. Defendant Stirbys and his subordinate staff of GTS required Plaintiffs and others similarly situated to use the Defendants' vehicles in performance of their duties, which were registered in Illinois and owned by Illinois-registered company and displayed "GTS" signs on the vehicle siding; this company branding is solely owned and managed by Defendant GTS. As a result, Plaintiffs and similarly situated drivers exclusively drove vehicles with GTS' branding. The requirement of displaying GTS' signs, branding and DOT MC numbers was equally imposed on all drivers as a condition of employment.

86. At least approximately 10% of the cargo that GTS required the Plaintiffs and putative class

members to transport was cargo deliveries to and from the Defendant company's customers located in Illinois. In addition, even if the deliveries were not to/from customers in Illinois, GTS's drivers would take certain routes through Illinois in order to haul loads for GTS.

87. Thus, Plaintiffs and other similarly situated truck drivers spent approximately twenty to thirty percent of their time or more commuting through the State of Illinois, regardless of whether Defendants' customers were in Illinois or not.

88. All of the instructions that the Plaintiffs and putative class members would receive came from GTS' dispatchers in Illinois.

89. GTS controlled every aspect of the drivers' working, including the work of the Plaintiffs. Such control included, but was not limited to the following:

    a. GTS required Plaintiffs and other similarly situated drivers to comply with instructions dictated by written and unwritten policies, procedures, and directives regarding Plaintiffs' and other similarly situated drivers' duties.

    b. Plaintiffs, as well as other similarly situated drivers, were required to report to or contact dispatchers employed by GTS in Illinois, at which time the Plaintiffs and other similarly situated drivers are provided with delivery assignments.

    c. Plaintiffs and other similarly situated drivers were instructed by GTS which loads to pick up, the location of the loads/goods to be delivered, as well as the timeframe during which the goods must be loaded onto the equipment. Additionally, the Defendant companies dictated and dictate the time by which the delivery must be made.

    d. GTS employed and employ managers who had supervisory responsibility over Plaintiffs and other similarly situated drivers, and who could and did assign and direct their work.

18

e. Plaintiffs and other similarly situated drivers were required to purchase and carry GPS devices, which allowed the Defendant company's personnel to track where the drivers were located throughout the day. GTS' dispatchers and supervisors also communicated with the Plaintiffs and similarly situated drivers while they were driving via telephone in order to convey instructions and otherwise oversee the drivers.

f. In order to be hired, the Plaintiffs and other similarly situated drivers were required to undergo background checks and drug tests.

g. Although GTS primarily advertised its jobs within various immigrant communities, attracted recent immigrants to work at the company, GTS required the drivers to have certain English language skills. GTS's policy was to impose fines and penalties (deducted from drivers' pay) in the event that a driver would incur violations for poor communication in English.

h. GTS insured its trucks and had other insurance for certain operational activities such as property damage, while the cost of such insurance policies was passed on to the drivers by means of deductions from their pay. The drivers, including the Plaintiffs, had no say as to which insurance policies to obtain.

i. If the Plaintiffs or other similarly situated drivers wish to take time off, GTS required them to give timely advance notice, and the Plaintiffs and other similarly situated drivers would be disciplined or terminated if they failed to provide such notice.

j. GTS' personnel advised Plaintiffs and other similarly situated drivers that their refusal to drive a load that had been assigned to them would result in immediate termination of their employment.

90. As part of their strict control over Plaintiffs' work, Defendant Stirbys and his subordinate

staff at GTS required that the Plaintiffs and putative class members submit all bills of lading, logbooks, and other required paperwork to GTS' office in Illinois.

91. At no time during their employment, could the Plaintiffs and other similarly situated drivers have their own customers and never had their own customers. The drivers, including Plaintiffs, could not choose and did not choose their own routes for delivery of cargo, could not and did not receive compensation or otherwise exchanged payment for their deliveries, but were compensated by GPS only. Equally, the drivers, including Plaintiffs, could not and did not negotiate any matters or bargains with any customers or brokers.

92. Plaintiffs and other similarly situated truck drivers shared similar job titles, followed the same policies and practices, performed similar duties, and as a result of GTS' common scheme of misclassification of drivers as independent contractors, unlawful deductions, and forgeries of records based upon the compensation was to be paid, were similarly subject to exploitation and denied compensation for their hard work for Defendants.

93. Defendant GTS engaged in unlawful practices by refusing to withhold payroll and social security taxes as to remit to federal and state government, to pay its share of payroll taxes, unemployment insurance contribution, and workmen's compensation on behalf of and for the benefit of Plaintiffs and as to others similarly situated, thus causing Plaintiffs and others similarly situated. GTS refused or otherwise failed to offer health insurance policies to its drivers.

Liability of individual defendant Stirbys

94. Defendant Stirbys had knowledge of the mutual assent between the Plaintiffs and GTS to compensate the Plaintiffs for all of their work because the individual Defendant had himself offered employment to Plaintiff Kalabayda, while his subordinates offered jobs to other named Plaintiffs. Defendant Stribys promised to compensate the drivers, including Plaintiff

Kalabayda, in full and on time based on a certain offered rate of compensation.

95. Defendant Stirbys was present at Plaintiff Kalabayda's hiring interview, and at the interviews of many drivers; he was aware of the terms offered to all Plaintiffs and other drivers, as he had set GTS' payment and hiring policies.

96. Defendant Stirbys similarly had knowledge of mutual assent between GTS and other drivers-members of the putative class as to the drivers accepting job offers on presented terms of compensation based on per mile basis or per hauled load basis and that the mutual assent to offered employment terms was formed based on promises to pay in full and on time.

97. Defendant Stirbys had knowledge of GTS systematically misclassifying its drivers as independent contractors because Stirbys was the one to mastermind the misclassification scheme.

98. Individual Defendant had actually entered into oral agreements with the drivers, including one named Plaintiff, or directed GTS staff subordinate to Stirbys to enter into such oral agreements with drivers, including two other named Plaintiffs on behalf of GTS, and induced the Plaintiffs and other similarly situated drivers to enter into said agreements and to work for GTS.

99. Plaintiffs began working as a result of promises of Defendant Stirbys and promises of subordinates of Stirbys that GTS would pay the drivers the promised compensation in full and on time and that GTS was paying current drivers' compensation in full and on time.

100. Defendant Stirbys knowingly permitted or otherwise caused GTS to wrongfully deny the payment of compensation to Plaintiffs and putative class members by actively and affirmatively directing the GTS staff subordinate to him to deny the earned and promised compensation, apply unlawful deductions to drivers' pay and deny the drivers' request to pay the final compensation and compensation for the last loads that the drivers would haul prior

to termination of their employment.

101.     On or about February 19, 2009, when GTS was incorporated, Defendant Stirbys masterminded and established the policies of misclassification and deductions which were aimed to violate an array of state and federal laws, including the IWPCA: (1) at the beginning of running his transportation services enterprise, he devised a scheme to misclassify the truck drivers as Independent Contractors and consequently, (2) underpay the drivers by taking illicit deductions from the drivers' compensation and by other illicit means.

102.     Once GTS began hiring drivers, Defendant Stirbys implemented his scheme to violate IWPCA and commit fraud by having: (1) instructed GTS' personnel employees to issue the paychecks which reflected underpaid or reduced compensation and instructing GTS staff to apply various deductions to drivers' compensation; (2) as in some instances, refused to issue, or directed the GTS staff subordinate to him to refuse to issue any paychecks to some drivers for the last few weeks of employment leading to termination, as in the case of Plaintiffs Plestsov and Kalabayda; and (3) instructed GTS personnel to doctor or otherwise falsify log books and freight/load rate confirmations.

103.     Defendant Stirbys implemented his exploitative scheme in full knowledge that most of the truck drivers GTS hired would take the job offered, not complain about underpayment of wages, and not seek any recourse in court or otherwise with government authorities. Stirbys targeted drivers who were immigrants, had low English language proficiency and lacked legal sophistication, so as to ensure a consistent power imbalance, which the individual Defendant used to his advantage and profit.

104.     Instead of running an honest business, Defendant Stirbys designed the above-described scheme of deductions and wage withholdings to take money from hard-working, vulnerable employees who could not or would not fight back.

105.     Defendant company's practices, as set up and implemented by Individual Defendant, violated multiple provisions of the Illinois Wage Payment and Collection Act.

106.     As a result of Defendant company's unlawful practices, as set up and implemented by Individual Defendant, the Defendant company and Individual Defendant profited immensely. They benefited from reduced labor and payroll costs by making illegal deductions and otherwise withholding pay from Plaintiffs and similarly situated drivers, as well as by doctoring logbooks and freight/load confirmations.

107.     As a result of Individual Defendant's improper and willful actions causing the Corporate Defendant to fail to pay Plaintiffs and others similarly situated in compliance with IWPCA, Plaintiffs and others similarly situated putative class members suffered lost wages and other actual damages.

## VI. CLASS ALLEGATIONS

108.     Plaintiffs bring these claims for relief on their own and as a class action pursuant to Fed R. Civ. P. 23. The proposed class is defined as:

   *"All persons who have worked for Defendant company as truck drivers and truck driver trainees in Illinois or otherwise have driven Defendant company's trucks at any time during the relevant statutory period, and who were misclassified as Independent Contractors based on oral or written agreements with Defendant Company or otherwise were misclassified in fact or in practice, and who personally provided freight transportation services to Defendant Company pursuant to such oral or written agreements with Defendant Company".*

109.     The Plaintiffs may assert sub-classes as to differentiate the drivers who were compensated on a per mile basis and the drivers who were paid on a percentage of a freight confirmation's dollar amount.

110. This action is properly maintainable as a class action under Rules 23(a) and 23(b) because:

   a. The proposed class of estimated 500 drivers is so numerous as to make joinder impracticable. Plaintiffs estimate that there may be approximately 250 drivers-members of a sub-class of drivers compensated on a per mile basis, and 250 drivers-members of a subclass of drivers compensated on a percentage of a load/freight confirmation basis.

   b. There are common questions of law and fact as to whether Defendant company improperly misclassified the drivers as independent contractors in violation of Section 2 of IWPCA and the drivers were and are in fact covered by the IWPCA; whether Defendants made unlawful deductions from drivers' compensation in violation of Section 9 of IWPCA, did not pay final compensation, and did not reimburse the drivers for work-related expenses in accordance with Section 9.5 of IWPCA; whether the proposed class members are entitled to statutory interest and attorney's fees and costs under Section 14 of IWPCA, whether Individual Defendant is liable under IWPCA.

   c. All claims arise from the same practice or course of conduct of Defendant company that gave rise to the Plaintiffs' claims and is based on the same theory – violation of IWPCA, and so such claims are typical.

   d. The Plaintiffs and their attorney will adequately protect the interests of the entire class.

   e. Determination of liability under IWPCA for misclassification, failure to pay for all work done, and unlawful deductions does not require individualized and fact intensive inquiry; and thus, proposed class is sufficiently cohesive to warrant adjudication by representation, and

   f. Class treatment in this case is the only appropriate means for the fair and efficient adjudication of the controversy because of the length of the dispute, the putative class

members' interests in individually controlling the prosecution of separate actions is minimal, the potential individual recoveries in this case are small enough to warrant class action treatment and this forum is the only appropriate forum for such an action because two named Plaintiffs, as well as other drivers-members of the putative class, reside in this District and the unlawful practices alleged by Plaintiffs occurred within Illinois.

## VII. <u>COUNT I</u>: VIOLATIONS OF ILLINOIS WAGE PAYMENT AND COLLECTIONS ACT

111. Plaintiffs re-alleges and incorporates paragraphs 1 through 110 above as and for paragraph 111 of this Count I:

112. Corporate Defendant is an "employer" within the meaning of Section 115/2 of IWPCA. Individual Defendant is an "employer" within the meaning of Section 115/13 of the IWPCA.

113. Defendants violated Section 115/2 of the IWPCA by misclassifying Plaintiffs and those similarly situated.

114. Defendants violated Section 115/3 and Section 115/4 of the IWPCA by failing to pay Plaintiffs and those similarly situated their wages in a timely manner.

115. Defendants violated Section 115/5 of the IWPCA by failing to pay Plaintiffs their final compensation in full and in a timely manner.

116. Defendants violated Section 115/9 of the IWPCA by making unauthorized deductions from the paychecks of Plaintiffs and those similarly situated. These deductions were not required by law, did not benefit Plaintiffs, were not made in response to a valid wage assignment order, and were not made with the express written consent of employees.

117. Defendants violated Section 115/9.5 of the IWPCA for failing to reimburse Plaintiffs and current employees-drivers (or otherwise employed since January 1, 2019) for all necessary expenditures or losses incurred by the employees-drivers within the corporate Defendant's

scope of employment and directly related to services performed for the Defendant company beginning with January 1, 2019, including Plaintiffs.

118.    Defendants violated Section 115/10 of the IWPCA by failing to notify Plaintiffs and those similarly situated of their true rate of pay in writing or orally at any point.

119.    The damages pled in this complain are exclusive of any additional damages to be determined after the review of genuine original freight/load confirmations for Plaintiffs Plestsov and Kalabayda, and any further interest that will accrue. Based on information Plaintiffs Plestsov and Kalabayda possess, the forgeries of freight confirmations typically resulted in being underpaid by approximately 10 percent. Accordingly, once the exact figures of underpayment per forged records are determined, Plaintiffs Plestsov and Kalabayda may assert additional damages.

120.    Individual Defendant Stirbys is personally liable for the corporate Defendant's violations of the IWPCA, pursuant to Section 115/13 of the IWPCA because he intentionally or otherwise knowingly permitted Corporate Defendant to violate IWPCA.

121.    Defendants are liable for all interest incurred, and attorney's fees and costs, pursuant to Section 115/14 of the IWPCA.

### VIII. <u>COUNT II</u>: EQUITABLE REMEDY FOR UNJUST ENRICHMENT ON *QUANTUM MERUIT* BASIS (plead in the alternative to Count I)

122.    Plaintiff re-alleges and incorporates paragraphs 1 through 110 above, as and for paragraph 122 of this Count II. Count II is pled in the alternative to Count I.

123.    Plaintiffs allege this Count in the alternative to Count I. As a result of Defendants' conduct as described above, Defendants unjustly enriched themselves to the detriment of Plaintiffs and Class Members in violation of the common law of the State of Illinois. Such unjust enrichment includes Defendants' requiring Plaintiffs and Class Members to be subject to

deductions for the costs of various, highway taxes, fuel, repairs among others.

124.  GTS received revenue and benefits by and through the efforts of Plaintiffs and the class members and improperly withheld their earned compensation on a per mile basis and tasks (percentage of a hauled load) performed, "wages" and/or "final compensation" to the detriment and damage caused to Plaintiffs and other similarly situated drivers, having taken such actions in violation of fundamental justice, equity and good conscience.

125.  Plaintiffs and the class members have conferred benefits on Defendant company through their services driving as interstate truck drivers hauling loads and cargo for Defendants' benefit and to their detriment because of Defendants' practices and policies of not paying them their earned compensation.

126.  GTS will be unjustly enriched if they are allowed to retain the improperly withheld earned compensation of its current and former drivers, which is estimated in excess of $5,000,000.00 on class basis.

127.  GTS will be unjustly enriched if it is allowed to retain its self-imposed forfeiture of withheld drivers' compensation.

128.  Plaintiffs and Class Members have been deprived by Defendants of the fair value of their services, as described above, and are, therefore, entitled to recover in quantum meruit, the value of their services pursuant to the common law of Illinois.

129.  This Count III is pleaded in an alternative to Count I.

## IX. JURY DEMAND

PLAINTIFFS REQUEST A TRIAL BY JURY ON ALL CLAIMS.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Honorable Court:

a.  Certifies the class and appoint Plaintiffs and Plaintiffs' counsel to represent the class;

b.  Finds that the Corporate Defendant violated the Illinois Wage Payment and Collection Act

by misclassifying Plaintiffs and other drivers-members of the class in violation of 820 ILCS §

115/2 and further violated Sections § 115/3, § 115/4, § 115/5, § 115/9, § 115/9.9, and § 115/10

of IWPCA;

c.   Holds GTS liable for all damages caused to Named Plaintiffs and member of the class in

amount of in excess of at least $5,500,000.00;

d.   Imposes penalties and interest pursuant to Section 14 of IWPCA;

e.   Awards all attorney's fees and costs in this litigation to Plaintiffs pursuant to Section 14 of

IWPCA;

f.   Finds that the Individual Defendant Tomas Stirbys is personally jointly and severally liable

for the Corporate Defendant's violations of IWPCA under Section 13 of the IWPCA;

g. In the event that no recovery is permitted under Count I, awards Plaintiffs and members of

the class equitable remedies of recovery on quantum meruit basis for Unjust Enrichment by

Defendants.

h.   Grants such other relief as this Court deems appropriate.

Respectfully submitted,

By: /s/ Julia Bikbova
Julia Bikbova, Plaintiffs' Attorney


Bikbova Law Offices, P.C.
Julia Bikbova
Attorney for Plaintiff
666 Dundee Rd, Suite 1604
Northbrook, IL 60062
847-730-1800
julia@bikbovalaw.com
ARDC# 6291400


Dated: March 18, 2020

28